# UNITED STATES DISTRICT COURT

for the

Eastern District of California

**FILED**

JUL 24 2015

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| 6 Cellular Telephones seized at | ) Case No. |
| 8299 Gwinhurst Circle | ) **2: 15 - SW 0 0 4 1 8   AC** |
| Sacramento, California | ) |
| | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

**SEE ATTACHMENTS A-1 through A-6, attached hereto and incorporated by reference.**

located in the _____ Eastern _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized):*

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a); | Distribution of a controlled substance; and |
| 21 U.S.C. § 846 | Attempt and conspiracy to commit the foregoing offense |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

☑ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 days: _____) is requested

☐ under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Karl Schmid, DEA Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 7/23/15

_____
*Judge's signature*

City and state: Sacramento, California

Allison Claire, U.S. Magistrate Judge
*Printed name and title*

## Affidavit of Special Agent Karl Schmid

I, Karl Schmid, being duly sworn, hereby depose and state:

## Purpose

1. This Affidavit is made in support of roll-over search warrants for six cellular telephones seized on January 27, 2015:

    a. One blue/black LG cellular telephone, serial number #411CYSF244966, as further described in Attachment A-1.

    b. One white Samsung Galaxy S5 cellular telephone, IMEI: 990004918865340, as further described in Attachment A-2.

    c. One gray Samsung cellular telephone, FCC ID: A3LSGHT599, as further described in Attachment A-3.

    d. One yellow/black IPhone, IMEI 358533052550371, as further described in Attachment A-4.

    e. One white Samsung Galaxy S4, IMEI: 990004391022138, as further described in Attachment A-5.

    f. One white Samsung Galaxy Note 4, IMEI: 990004825637154, as further described in Attachment A-6.

2. This Affidavit is in support of roll-over search warrants based upon a federal search warrant that were executed on January 27, 2015. The affidavit from case 2:15-SW-0012-EFB is attached as Exhibit 1 and is hereby incorporated by reference.

## Agent Background

3. I am a Special Agent of the United States Department of Justice, Drug Enforcement Administration ("DEA"). I have been a DEA Special Agent since July 2012. Prior to working for DEA, I was employed as a police officer for the City of Virginia Beach Police Department from 2005 to 2012. I am currently assigned to the DEA Sacramento District Office charged with investigating major drug trafficking organizations operating in the Eastern District of California, and elsewhere. As a DEA agent, I have assisted in the execution of search warrants on many occasions for controlled substances and/or related paraphernalia, indicia, and other evidence of violations of federal drug statutes. I

1

have participated in investigations targeting individuals and organizations trafficking heroin, cocaine, marijuana, methamphetamine, and other controlled substances. I have also become familiar with the manner in which drug traffickers use telephones, often cellular telephones, to conduct their illegal operations.

4. Through my training, experience, and interaction with other experienced special agents, task force agents, and other drug investigators, I have become familiar with the methods employed by drug traffickers to smuggle, safeguard, store, transport, and distribute drugs; to collect and conceal drug related proceeds; and to communicate with other participants to accomplish such objectives. I have received specialized training in narcotics investigation matters including, but not limited to, drug interdiction, drug detection, money laundering techniques, and drug identification from DEA. In addition, I have served as both a monitor and wire room supervisor on at least four federal wiretap investigations. I have also consulted with more experienced DEA Special Agents in the preparation of this Affidavit.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6. I am a "Federal law enforcement officer" within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure, that is, a federal law enforcement agent engaged in enforcing criminal laws and authorized to request a search warrant.

## **Statement of Probable Cause**

### *Execution of Search Warrants*

7. On January 27, 2015, agents executed a federal search warrant (2:15-SW-0012-EFB) at 8299 Gwinhurst Circle, the residence of Clifford MCDOWELL III and Khanjee LEE. During the execution of the search warrant Clifford MCDOWELL III was arrested pursuant to a federal arrest warrant (2:15-MJ-0014-EFB) for violations of 21 U.S.C. 841(a)(1) and 21 U.S.C. 846 related to methamphetamine. Khanajee LEE was initially arrested for violations of the California State Health and Safety Code related to the distribution of methamphetamine. These state charges were later dismissed and Khanajee LEE was subsequently arrested under a federal arrest warrant (2:15-MJ-0062) for violations of 21 U.S.C. 841(a)(1) and 21 U.S.C. 846 related to methamphetamine.

8. During the execution of the search warrant of 8299 Gwinhurst Circle, MCDOWELL and LEE's residence, agents located approximately 152 grams of processed marijuana, 32 grams of suspected heroin, a digital scale, drug packaging material, pay and owe sheets, $9,110.00 USC, a stolen handgun, and six cellular telephones described in Attachments A-1 through A-6.

9. All six of the cellular telephones (Attachment A-1 through A-6) seized were located in the master bedroom of 8299 Gwinhurst Circle. Agents identified that this bedroom was primarily used by MCDOWELL and LEE.

   a. Based upon my training and experience, I know that some drug traffickers use cellular telephones and other electronic devices to communicate for a number of purposes related to their criminal activities. I also know that, some drug traffickers use more than one cellular telephone or frequently change cellular telephones as a method to avoid identification by law enforcement. I know through my experience with this investigation that MCDOWELL uses cellular telephones to facilitate drug deliveries to drug customers and to facilitate other drug related matters with his associates. During this investigation, the Honorable District Judge John A. Mendez, Eastern District of California, authorized the interception of wire and electronic communication (2:14-SW-466-JAM) related to one of MCDOWELL's cellular telephones. Some examples of MCDOWELL's use of a cellular phone to facilitate drug trafficking can be found on pages 16-23 of the attached Affidavit. During the course of this investigation I have identified that MCDOWELL has used more than one cellular telephone. Accordingly, based upon my training and experience, and MCDOWELL's use of his cellular telephone in furtherance of drug trafficking activities, I believe that cellular telephones (Attachment A-1 through A-6) found in MCDOWELL and LEE's bedroom will contain evidence related to drug trafficking.

10. The items listed in Attachment A-1 through A-6 have been preserved as evidence by agents and have been in the custody of the DEA Sacramento District Office since the execution of the search warrant on January 27, 2015.

///

///

///

## AUTHORIZATION REQUEST

11. Based upon the information set forth above, your affiant submits that there is probable
    cause to believe that the items and information listed on Attachment B will be located in
    the items described in Attachments A-1 through A-6, and I request that search warrants
    be issued for those items, all of which are in the Eastern District of California.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my
knowledge and belief.

Karl Schmid
DEA Special Agent

Sworn and Subscribed to me on July 23, 2015,

Hon. ALLISON CLAIRE
United States Magistrate Judge

Approved as to form:

JUSTIN L. LEE
Assistant United States Attorney

4

# ATTACHMENT A-1

*Item to be Searched*

One blue/black LG cellular telephone, serial number #411CYSF244966, seized from Clifford MCDOWELL III and Khanajee LEE's residence at 8299 Gwinhurst Circle, Sacramento, California on January 27, 2015.

The Device is currently in the custody of the Drug Enforcement Administration. This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT A-2

## *Item to be Searched*

One white Samsung Galaxy S5 cellular telephone, IMEI: 990004918865340, seized from Clifford MCDOWELL III and Khanajee LEE's residence at 8299 Gwinhurst Circle, Sacramento, California on January 27, 2015.

The Device is currently in the custody of the Drug Enforcement Administration. This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT A-3

*Item to be Searched*

One gray Samsung cellular telephone, FCC ID: A3LSGHT599, seized from Clifford MCDOWELL III and Khanajee LEE's residence at 8299 Gwinhurst Circle, Sacramento, California on January 27, 2015.

The Device is currently in the custody of the Drug Enforcement Administration. This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

7

# ATTACHMENT A-4

*Item to be Searched*

One yellow/black IPhone, IMEI 358533052550371, seized from Clifford MCDOWELL III and Khanajee LEE's residence at 8299 Gwinhurst Circle, Sacramento, California on January 27, 2015.

The Device is currently in the custody of the Drug Enforcement Administration.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

8

# ATTACHMENT A-5

*Item to be Searched*

One white Samsung Galaxy S4 cellular telephone, IMEI: 990004391022138, seized from Clifford MCDOWELL III and Khanajee LEE's residence at 8299 Gwinhurst Circle, Sacramento, California on January 27, 2015.

The Device is currently in the custody of the Drug Enforcement Administration. This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT A-6

*Item to be Searched*

One white Samsung Galaxy Note 4 cellular telephone, IMEI: 990004825637154, seized from Clifford MCDOWELL III and Khanajee LEE's residence at 8299 Gwinhurst Circle, Sacramento, California on January 27, 2015.

The Device is currently in the custody of the Drug Enforcement Administration. This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT B

*Items to be Seized*

This search warrant grants authority to seize all of the items set forth below:

1. Any and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data in the memory of the mobile telephone or on a server and associated with the mobile telephones, including:

   a. Incoming call history;

   b. Outgoing call history;

   c. Missed call history;

   d. Outgoing text messages;

   e. Incoming text messages;

   f. Draft text messages;

   g. Telephone book;

   h. Data screen or file identifying the telephone number associated with the mobile telephone searched;

   i. Data screen, file, or writing containing serial numbers or other information to identify the mobile telephone searched;

   j. Voicemail;

   k. User-entered messages (such as to-do lists); and

   l. Stored media such as photographs or video.

2. Any passwords used to access the electronic data described above.

3. Any and all locations, addresses, GPS coordinates, names, time/date information, or other electronic data related to addresses and driving directions.

4. All information and records related to drug trafficking, including:

   a. Data and information related to stored applications and/or websites used to communicate with associates and co-conspirators;

   b. lists of customers and related identifying information;

   c. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    d.  any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

    e.  any information recording schedule or travel;

    f.  all bank records, checks, credit card bills, account information, and other financial records.

    g.  records of Internet Protocol addresses used;

    h.  records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

5.  Evidence of user attribution showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

# Exhibit 1

AO 93 (Rev. 12/09) Search and Seizure Warrant

**SEALED**

## UNITED STATES DISTRICT COURT

**ORIGINAL FILED**

for the

Eastern District of California

FEB 0 4 2015

| | | |
|---|---|---|
| In the Matter of the Search of | ) | CLERK, U.S. DISTRICT COURT |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | EASTERN DISTRICT OF CALIFORNIA |
| | ) Case No. | BY _____ |
| 8299 Gwinhurst Circle, Sacramento, California | ) | DEPUTY CLERK |
| | ) | |
| | ) | **2: 15 - SW - 0 0 1 2   EFB** |

### SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer ·

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the      **EASTERN**      District of      **CALIFORNIA** *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A-1**

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before      **February 2, 2015**
                                        *(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.      ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
Hon. Edmund F. Brennan or duty magistrate judge      .
        *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐ for _____ days *(not to exceed 30)*.
                                        ☐ until, the facts justifying, the later specific date of _____.

Date and time issued: 1-23-2015
   at 3:35 p.m.                                        _____
                                                                *Judge's signature*

City and state:   Sacramento, California        Hon. Edmund F. Brennan, U.S. Magistrate Judge
                                                        *Printed name and title*

## Attachment A-1

*Location to be Searched: 8299 Gwinhurst Circle, Sacramento, California.*

The premise to be searched is 8299 Gwinhurst Circle, Sacramento, California, which is located near the south east corner of the intersection of Hardester Drive and Gwinhurst Circle, Sacramento, California. The numbers "8299" are posted on a pillar to the right of the front door. A picture of 8299 Gwinhurst Circle, Sacramento, California is provided below.

The residence to be searched is a two story residential home with a wooden fence around the backyard. The residence has beige siding with some brick accents and a dark composite roof. The residences front door is located on the west side of the residence and faces north. The residence also has two attached garages which face north.

The search of the aforementioned residence shall include:
ANY AND ALL attachments, to include attics, basements, garages, safes, carports, outbuildings, trailers, appurtenances thereto, and all other areas within the curtilage, and a 2011 Ford Explorer bearing California license plate: 7GDU010, and any vehicles parked on the premises.



## **Attachment B**

*Items to be Seized*

1. Any cocaine, methamphetamine, heroin, MDMA, Marijuana, drugs or drug paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting or cutting agents; drug packaging materials, including plastic, tin foil, cellophane, jars, plastic bags, capsules, and other containers;

2. United States currency and foreign currency; money counting machines; and money wrappers;

3. Money ledgers, drug distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed;

4. Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics;

5. Telephone paging devices, beepers, cellular telephones, car phones, answering machines and tapes, and other communication devices;

6. Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, photographs, audio and video recordings, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

7. Financial instruments purchased with large amounts of currency, including travelers checks, bonds, stock certificates, cashier's checks and certificates of deposit;

8. Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, or jewelry;

9. Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, rental vehicle agreements, hotel and restaurant receipts, canceled checks, maps and written directions to location;

10. Handguns, shotguns, rifles, ammunition and other firearms;

11. Devices commonly used to conduct counter-surveillance against law enforcement including, but not limited to, scanners, police radios, surveillance cameras, recordings of surveillance footage, monitors, anti-bugging devices, and devices used to detect the presence of wiretaps, recording devices, transmitters, and/or receipts or literature describing the same;

12. Personal property tending to show the existence and/or location of other stored illegal drugs including, but not limited to, storage locker receipts, records, and maps, safety deposit keys and corresponding documents;

13. Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records.

AO 93 (Rev. 12/09) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>2:15-SW-0012 | Date and time warrant executed:<br>EFB    01-27-15   0600 | Copy of warrant and inventory left with:<br>8299 Gwinhurst Cir. |

| Inventory made in the presence of :<br>SA Cindy Yamasaki |
|---|

| Inventory of the property taken and name of any person(s) seized: |
|---|

-suspected  Marijuana
-unknown amount of US currency
-5mall white color pills
-small black digital scale w/ white residue
-SD card
-3 notebooks
-kel tec 380 auto pistol SN#HVJ01 w/1 magazine w/6 rounds 1 in ch
 chamber
-6 cellular telephones
-plastic bag containing a brown substance
-plastic bag containing empty pill casings

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: 02-04-15

_Executing officer's signature_

Karl Schmid, SA
_Printed name and title_

Subscribed, sworn to, and returned before me this date.

_Signature of Judge_  KENDALL J. NEWMAN   Date  2/4/2015

U.S. MAGISTRATE JUDGE

1 | BENJAMIN B. WAGNER
United States Attorney
2 | JUSTIN L. LEE
Assistant U.S. Attorney
3 | 501 I Street, Suite 10-100
Sacramento, CA  95814
4 | (916) 554-2700

SEALED ORIGINAL
FILED

JAN 23 2015

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
          DEPUTY CLERK

5

6

7

8                 IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11 | IN THE MATTER OF THE            )
     APPLICATION OF THE UNITED STATES )      2:15 - SW - 0012    EFB
12 | OF AMERICA FOR A SEARCH WARRANT )
     CONCERNING:                    )
13 |                                )      SEALING ORDER
                                    )
14 |                                )
     8299 Gwinhurst Circle,         )      UNDER SEAL
15 | Sacramento, California         )
                                    )
16 |                                )
                                    )
17 |                                )
                                    )
18 | _____)

19

20        Upon application of the United States of America and good cause

21 | having been shown,

22        IT IS HEREBY ORDERED that the file in the above-captioned matter

23 | be, and is, hereby ordered sealed until further order of this Court.

24

25 | DATED: January 23, 2015

26

27                              HON. EDMUND F. BRENNAN
                                UNITED STATES MAGISTRATE JUDGE

28

SEALED ORIGINAL

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

### for the

### Eastern District of California

JAN 23 2015

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>**8299 Gwinhurst Circle, Sacramento, California** | Case No.<br>**2: 15 - SW - 0012 — EFB** |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A-1**

located in the      **EASTERN**      District of      **CALIFORNIA**      , there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | *Offense Description* |
|---|---|
| 21 U.S.C. section 841(a); | Distribution of a controlled substance; and |
| 21 U.S.C. section 846 | Attempt and conspiracy to commit the foregoing offense |

The application is based on these facts:

See Affidavit of Special Agent Karl Schmid in Support of Search Warrant

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

**Karl Schmid, DEA Special Agent**
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **1-23-2015**

_____
*Judge's signature*

City and state:   **Sacramento, California**

**Hon. Edmund F. Brennan, U.S. Magistrate Judge**
*Printed name and title*

## Affidavit of DEA Special Agent Karl Schmid

I, Karl Schmid, being duly sworn, hereby depose and state:

## Purpose

1. This Affidavit is made in support of a search warrant for:

   a. **8299 Gwinhurst Circle, Sacramento, California**, as further described in Attachment A-1, the residence of Clifford MCDOWELL and Khanajee LEE.

   b. **5541 Crystal Hill Way, Sacramento, California**, as further described in Attachment A-2, the residence of Jessie WRIGHT.

2. This Affidavit is also made in support of arrest warrants for:

   a. **Clifford Abram MCDOWELL III**
   b. **Jessie WRIGHT**

   | | |
   |---|---|
   | **COUNT ONE:** | Distribution of Methamphetamine, in violation of 21 U.S.C. § 841(a)(1) (July 23, 2014) |
   | **COUNT TWO:** | Distribution of Methamphetamine, in violation of 21 U.S.C. § 841(a)(1) (September 5, 2014) |
   | **COUNT THREE:** | Conspiracy to Distribute Methamphetamine, in violation of 21 U.S.C. §§ 846 and 841(a)(1) |

3. This Affidavit is also made in support of a geo-location search warrant for cellular telephone:

   a. **(917) 943-6802 ("TT#4")**, ESN: 353307062483021, Sha Ruler, 5500 Mack Rd, Sacramento, CA 95823, believed to be used by Jessie WRIGHT.

## Agent Background

1. I am a Special Agent of the United States Department of Justice, Drug Enforcement Administration ("DEA"). I have been a DEA Special Agent since July 2012. Prior to working for DEA, I was employed as a police officer for the City of Virginia Beach

1

Police Department from 2005 to 2012. I am currently assigned to the DEA Sacramento District Office charged with investigating major drug trafficking organizations operating in the Eastern District of California. As a DEA agent, I have assisted in the execution of search warrants on many occasions for controlled substances and/or related paraphernalia, indicia, and other evidence of violations of federal drug statutes. I have participated in investigations targeting individuals and organizations trafficking cocaine, heroin, marijuana, and methamphetamine. During the course of my career as a police officer and DEA Special Agent, I have participated in at least one hundred drug investigations. Through my training, experience, and interaction with other experienced special agents, task force agents, and other drug investigators, I have become familiar with the methods employed by drug traffickers to smuggle, safeguard, store, transport, and distribute drugs; to collect and conceal drug related proceeds; and to communicate with other participants to accomplish such objectives. I have received specialized training in matters of drug investigation including, but not limited to, investigative techniques, drug interdiction, drug detection, money laundering, and drug identification from DEA.

2. During the course of these one hundred investigations, I have become familiar with the manner in which drug traffickers use telephones, often cellular telephones, to conduct their illegal operations. I have participated in four separate wire interception cases, encompassing at least eight telephones. I have previously written three wire interception affidavits. Furthermore, I have served as both a monitor and wire room supervisor on three federal wiretap investigations. Additionally, I attended the California Department of Justice's eight-hour wire interception certification course, as set out in California Penal Code § 629.94.

3. I am a "law enforcement officer" within the meaning of 18 U.S.C. § 2510(7), that is, a federal law enforcement agent engaged in enforcing criminal laws.

4. The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This Affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## Statement of Probable Cause

### *Initiation of the Investigation*

5. This Affidavit is submitted in connection with a joint DEA and Sacramento Police Department (collectively, "the Investigating Agencies") investigation of a drug

2

trafficking organization ("DTO") operating in Sacramento, California. In April 2013, the Sacramento Police Department received an anonymous tip about drug sales within the City of Sacramento. Through an independent investigation the DEA and the Sacramento Police Department have identified Jessie WRIGHT, Clifford MCDOWELL, and other associates as methamphetamine, heroin, and marijuana distributors operating in Sacramento, California, within the Eastern District of California. During the course of the investigation, the Investigating Agencies conducted several controlled purchases of drugs, obtained information through confidential sources and search warrants, and conducted Title III wiretaps for WRIGHT and MCDOWELL's telephones.

### Clifford Abram MCDOWELL III



6. Clifford MCDOWELL is a 35-year-old male. MCDOWELL is currently on formal/searchable probation for prior criminal convictions out of the Sacramento County ~~Probation Office~~ Superion Court which is valid through 2016. MCDOWELL's criminal history is as follows: KB

    i. 1998, felony possession/purchase cocaine base for sale conviction with a sentence of 3 years prison and 3 years probation.

    ii. 2000, misdemeanor impersonate to make other liable conviction with a sentence of 90 days in jail.

    iii. 2003, misdemeanor DUI alcohol/drugs conviction with a sentence of 180 days in jail and 3 years probation.

    iv. 2007, misdemeanor battery conviction with a sentence of 2 days in jail and 3 years probation.

    v. 2008, felony DUI alcohol with priors conviction with a sentence of 12 days in jail and 5 years probation.

    vi. 2008, felony grand theft: money/labor/property conviction with a sentence of 2 years prison.

    vii. 2011, felony DUI conviction with a sentence of 16 months prison.

### Jessie WRIGHT

7. Jessie WRIGHT is 36-year-old male. WRIGHT's criminal history is as follows:

    i. 1998, felony first degree burglary conviction with a sentence of probation.

    ii. 2000, felony first degree burglary conviction with a sentence of 180 days in jail and 5 years probation.

    iii. 2000, felony possession of a controlled substance conviction with a sentence of 32 months in prison.

     iv. 2006, misdemeanor infliction of corporal punishment on spouse conviction with a sentence of 30 days in jail.

     v. 2006, misdemeanor driving under the influence of alcohol/drugs and attempted escape after arrest convictions with a sentence of 58 days in jail and 3 years probation.

     vi. 2009, misdemeanor driving under the influence of alcohol/drugs and evading a peace officer convictions with a sentence of 32 months in prison.

*Background of the Controlled Purchases of Drugs*

8. During the course of this investigation, the Investigating Agencies have conducted several controlled purchases of drugs involving WRIGHT, MCDOWELL, and other associates. These controlled purchases are detailed below and were conducted with the assistance of a confidential source ("CS#1"), acting at the direction of the Investigating Agencies.

    a. CS#1 is currently working for DEA in exchange for monetary compensation. CS#1 is a Mexican national who is lawfully present in the United States on a significant public benefit parole visa ("SPBP Visa") that was sponsored by DEA. CS#1 was previously convicted in 2005 of Distribution of Cocaine and sentenced to three years incarceration. After serving his prison sentence, CS#1 was deported to Mexico. CS#1 has worked with law enforcement since 2009. CS#1's information has proven to be reliable in this investigation and three previous investigations in which CS#1 has provided information.

*April 2014 Controlled Purchases of Cocaine*

9. On April 24, 2014, DEA conducted a controlled purchase of one ounce of cocaine from WRIGHT. On April 24, 2014, CS#1 called WRIGHT at telephone number 916-873-9729, referred to as "TT#1". This call was recorded and the number dialed was verified by toll records. During the call, WRIGHT and CS#1 arranged the location, time, and price for a one ounce cocaine purchase.

10. At approximately 4:05 p.m., WRIGHT arrived at the arranged location for the drug transaction, the parking lot of the Coco's restaurant in Sacramento. Upon arriving, WRIGHT (using TT#1) called CS#1 in order to find CS#1 in the parking lot. Once WRIGHT and CS#1 made contact in the parking lot, CS#1 got into WRIGHT's vehicle. WRIGHT was accompanied in his car by an unidentified male. The interaction between WRIGHT and CS#1 was recorded using a concealed audio

4

recording device.  Inside the car, WRIGHT asked CS#1 if CS#1 was a law
enforcement officer.  CS#1 told WRIGHT that he was not a law enforcement officer.
WRIGHT provided a clear package with white powder to CS#1.  CS#1 handed $1,050
in prerecorded DEA buy money directly to WRIGHT.

11. The white powder subsequently field tested positive for cocaine with a weight of
approximately one ounce.  The cocaine was sent to the DEA lab for further testing.
The results are pending.  The packaging material was tested for fingerprints.  The
fingerprint results are pending.  CS#1 was searched by agents for contraband and
currency before and after the controlled purchase, with negative results.

12. While inside of WRIGHT's car, WRIGHT and CS#1 discussed prices for a kilogram
of cocaine.  WRIGHT quoted CS#1 a price of $27,000 for a kilogram of cocaine from
one source or $32,000 for a kilogram of cocaine from a different source.  WRIGHT
and CS#1 also discussed trading cocaine for marijuana.  WRIGHT indicated that he
had a source of supply that would trade cocaine for high quality marijuana.  CS#1 led
WRIGHT to believe that he could provide marijuana in exchange for cocaine.  CS#1
inquired if WRIGHT had access to quality methamphetamine.  WRIGHT showed
CS#1 what CS#1 believed was sample of methamphetamine that was in the car.
WRIGHT said that the sample of methamphetamine was spoken for, but told CS#1
that he could supply CS#1 with methamphetamine in the future.  WRIGHT also told
CS#1 that WRIGHT could provide heroin.



### *May 2, 2014, Controlled Purchases of Methamphetamine*

13. On April 27, 2014, CS#1 made a recorded telephone call to WRIGHT on TT#1.  This
call was subsequently verified with toll records.  During the call, CS#1 told WRIGHT
that the cocaine purchased on April 24, 2014, was of good quality but the quoted price
for a kilogram of cocaine was too high.  WRIGHT told CS#1 that the price would be
lower if CS#1 purchased more than one kilogram.  CS#1 told WRIGHT that he wanted
to purchase a quarter-pound of methamphetamine.  CS#1 asked WRIGHT to quote
him a price for an ounce and for a pound of methamphetamine.  CS#1 and WRIGHT
agreed that WRIGHT would contact CS#1 once WRIGHT had obtained the quoted
prices.

14. CS#1 and WRIGHT (using TT#1) subsequently exchanged several calls over the
course of four days regarding a future methamphetamine transaction.  These telephone
calls were recorded and verified with toll records.  During these calls, WRIGHT told
CS#1 that both WRIGHT and WRIGHT's supplier were hesitant to deal with CS#1
because they did not know CS#1 very well and they were concerned that he could be

involved with law enforcement. Notwithstanding these concerns, WRIGHT and CS#1 arranged for a methamphetamine deal on May 2, 2014.

15. On May 2, 2014, CS#1 arrived at the agreed upon location for the drug transaction, the Elephant Bar in Sacramento. Inside of the bar, CS#1 was approached by an unknown female, later determined to be Laura THOMAS. CS#1 denied being the person that THOMAS was looking for. THOMAS left CS#1 but stayed inside the restaurant. Shortly thereafter, CS#1 received an incoming call from WRIGHT (using TT#1). WRIGHT told CS#1 that he had sent a female named "Stacy" (THOMAS) on his behalf. After hanging up, CS#1 approached THOMAS and introduced himself. At this time THOMAS introduced herself to the CS as "Stacy."

16. THOMAS told CS#1 that she had been sent by WRIGHT to vet CS#1. CS#1 and THOMAS ate lunch together. During lunch, THOMAS received an incoming call on her cellular phone. THOMAS told WRIGHT over her cellular phone that CS#1 was "cool." THOMAS then handed the cellular phone to CS#1 and CS#1 spoke briefly with WRIGHT. WRIGHT indicated to CS#1 that he was on his way to the Elephant Bar to conduct the previously agreed upon drug transaction. During this call, agents observed THOMAS hand the cellular phone to the CS, after briefly talking on the phone herself. Only one side of this conversation was recorded using the concealed transmitter/recorder worn by CS#1.

17. Based on my training and experience and what I have learned during the investigation of WRIGHT, I believe that WRIGHT directed THOMAS to meet with CS#1 to determine if CS#1 was working for law enforcement. THOMAS indicated that this was her purpose when she explained to CS#1 why she was meeting with CS#1. She told CS#1 that she was a people person and had been sent to get to know CS#1. Therefore, when THOMAS subsequently called WRIGHT and told him that CS#1 was "cool," I believe that she was communicating to WRIGHT that CS#1 was not working for law enforcement and therefore could be trusted to do a drug transaction.

18. CS#1 and THOMAS exited the restaurant and went to CS#1's car. While in the parking lot, THOMAS called WRIGHT using her cellular telephone and handed the phone to CS#1. CS#1 spoke to WRIGHT using THOMAS's cellular telephone and directed WRIGHT to CS#1's location in the parking lot. After WRIGHT arrived in the parking lot, CS#1 handed the phone back to THOMAS. CS#1 overhead WRIGHT tell THOMAS to walk back to THOMAS's vehicle which was also in the parking lot. CS#1 stayed at CS#1's vehicle.

19. The above telephone exchange was observed by a surveillance agent and part of CS#1's conversation with WRIGHT was recorded over the concealed transmitter/recorder worn by CS#1. Agents were also able to verify through analysis of toll records that TT#1 was in contact with telephone number 916-904-2175, THOMAS's telephone number, at approximately the same time the surveillance agent observed CS#1 talking to WRIGHT on THOMAS's cellular phone.

20. At about the same time, surveillance agents observed a vehicle driven by Andre ALLEN, with WRIGHT in the passenger seat, pull up next to THOMAS, as she walked away from CS#1. THOMAS got into WRIGHT's vehicle, then immediately exited WRIGHT's vehicle, now carrying a black bag. THOMAS returned directly to CS#1's car. THOMAS showed the contents of the black bag to CS#1 and then CS#1 removed a clear plastic bag containing a white, crystal-like substance from the black bag. THOMAS told CS#1 that WRIGHT instructed her to tell CS#1 that it was all four ounces. CS#1 then gave THOMAS $2,200 in prerecorded DEA buy money. THOMAS exited CS#1's vehicle and proceeded directly back to the vehicle that WRIGHT was travelling in. THOMAS got into the WRIGHT's vehicle briefly and then exited.

21. The white, crystal-like substance subsequently field tested positive for methamphetamine with a weight of approximately four ounces. The methamphetamine was sent to the DEA lab for further testing. The results are pending. The packaging material was tested for fingerprints. The fingerprint results are pending. CS#1 was searched for currency and contraband prior to and after the above controlled purchase, with negative results.

22. Directly after the transaction, CS#1 received an incoming telephone call from WRIGHT, who was using TT#1. Agents verified CS#1's contact with TT#1 through toll records. This conversation was also recorded. During the call, WRIGHT inquired if the CS#1 was satisfied with the drug deal and assured CS#1 that WRIGHT would not rip CS#1 off because THOMAS was WRIGHT's friend.

*May 29, 2014, Controlled Purchases of Methamphetamine*

23. On May 29, 2014, CS#1 called WRIGHT on TT#1 and arranged to purchase four ounces of methamphetamine. CS#1 and WRIGHT, who was using TT#1, exchanged several calls throughout the day in an effort to coordinate the anticipated controlled purchase of methamphetamine. These calls were recorded and the contacts with TT#1 were verified through toll analysis. Below are three transcribed pertinent excerpts from the conversations between CS#1 and WRIGHT:

**Excerpt #1**

| CS#1 | Hey!  What's Up? |
|------|------------------|
| TT#1 | What's up buddy. |
| CS#1 | Not much man ....I just called you.  You know what...I'm going to be in town in like...like in 10 minutes 15 minutes I'm crossing by man...I'm sorry...I'm sorry man...I didn't let you know, because I didn't know I was coming this way....but...um....can we do the same...as last time? |
| TT#1 | Yeah...well what...what was it 5, 4? |
| CS#1 | Yeah...the four...the same....the same as last time. |
| TT#1 | Ok...you ready right now? |
| CS#1 | Yeah. |
| TT#1 | Ok...let me call you right back. |
| CS#1 | Alright Man...Ok. |
| TT#1 | Ok...Ok..bye-bye. |

**Excerpt #2**

| CS#1 | Hello. |
|------|--------|
| TT#1 | Yeah...I'm going to pick it up now. |
| CS#1 | Alright. |
| TT#1 | Where you at? Same spot? |
| CS#1 | Yeah...the same area...around the same area...the same spot...the last time. |
| TT#1 | Ok. |
| CS#1 | Alright. |
| TT#1 | Ok ...Alright. |
| CS#1 | Alright man. |
| TT#1 | I'm going to get it...so answer your phone man...I'm going to get it now. |
| CS#1 | Alright man. You just tell me when you are like 5 to 10 minutes from there and then I will be there. |
| TT#1 | Ok...Alright. |

8

| CS#1 | Alright...bye. |
|------|----------------|
| TT#1 | Adios. |

<u>Excerpt #3</u>

| TT#1 | Heading up there now...I just got it...bro.  I got it with me, so head up there now. |
|------|-------------------------------------------------------------------------------------|
| CS#1 | Ok...alright..man. |
| TT#1 | Ok...and..uh..uh...uh...the extra in there..everything... head up there now. |
| CS#1 | Ok...great man.  The same place...the elephant...right? |
| TT#1 | Yeah...the usual spot. |
| CS#1 | Alright...see you man. |
| TT#1 | Ok. |

24. During the above telephone calls, WRIGHT agreed to provide CS#1 methamphetamine. This is indicated by CS#1 asking, "can we do the same...as last time?" The CS was using vague language, referring to the prior methamphetamine controlled purchase on May 2, 2014, in order to ask WRIGHT to provide CS#1 with four ounces of methamphetamine for the $2,200.  WRIGHT answers by saying, "Yeah...well what...what was it 5, 4?" I believe WRIGHT was asking if the last transaction had been for four ounces of methamphetamine or five ounces of methamphetamine. CS#1 then confirms that CS#1 was interested in purchasing four ounces of methamphetamine for the same price of the prior controlled purchase by saying, "four....the same...the same as last time."

25. CS#1 and WRIGHT chose to conduct the deal at the same location as the May 2, 2014, methamphetamine controlled purchase.  This is shown when CS#1 asks, "The same place...the elephant...right?" and WRIGHT replies, "Yeah...the usual spot." WRIGHT also says, "Yeah...I'm going to pick it up now." And "Heading up there now...I just got it...bro.  I got it with me, so head up there now."  I believe that prior to meeting with CS#1, WRIGHT had to pick up the methamphetamine from someone else, most likely a source of supply or a from a drug stash location.

26. Agents conducted surveillance of WRIGHT prior to the controlled purchase of methamphetamine.  During the surveillance, agents observed WRIGHT drive to, and stop briefly at 8241 Rivallo Way, Sacramento, California.  Agents were able to

identify that 8241 Rivallo Way was the residence of MCDOWELL at the time of the May 29, 2014, controlled purchase of methamphetamine. MCDOWELL has since moved and is no longer associated with the address 8241 Rivallo Way.

27. Prior to CS#1's arrival at the Elephant Bar, surveillance agents observed THOMAS arrive and meet with WRIGHT who had parked in the Elephant Bar parking lot. CS#1 subsequently arrived at the parking lot and was greeted by THOMAS. THOMAS got into CS#1's car. THOMAS took a plastic shopping bag out of her purse and set it on the center console of the car. The plastic shopping bag contained two smaller bags, which further contained a white, crystal-like substance. CS#1 then handed $2,200 in prerecorded DEA buy money to THOMAS. THOMAS counted the money twice and told CS#1 that WRIGHT had told her to count the money because she had not counted it during the last drug transaction with CS#1. Prior to exiting the vehicle, THOMAS told CS#1 that her name was Laura and not "Stacy" as she had previously told CS#1. THOMAS then put the money in her purse and exited the vehicle. Surveillance units then observed THOMAS walk to WRIGHT's vehicle and meet with WRIGHT for a short period of time.

28. While still in the parking lot, CS#1 called WRIGHT, on TT#1. This call was recorded and the contact with TT#1 was verified by toll records. During the conversation, CS#1 told WRIGHT that the deal was good and that CS#1 would call WRIGHT in a couple weeks to get more.

29. The white, crystal-like substance subsequently field tested positive for methamphetamine with a weight of approximately four ounces. The methamphetamine was sent to the DEA lab for further testing and the results are pending. The packaging material was tested for fingerprints. The fingerprint results are also pending. CS#1 was searched for drugs and currency both before the drug transaction and after the drug transaction with negative results.

### July 23, 2014, Controlled Purchases of Methamphetamine

30. Between July 17, 2014, and July 23, 2014, CS#1 and WRIGHT exchanged several telephone calls and text messages discussing the purchase of one pound of methamphetamine from WRIGHT. On July 17, 2014, CS#1 placed a recorded telephone call to WRIGHT on TT#1 at approximately 12:33 p.m. Contact with TT#1 was verified through toll records. During this call, CS#1 asked WRIGHT for the price of one pound of methamphetamine. WRIGHT answered by saying, "They want five, but if you get more than one it drops to four." CS#1 then ordered one pound of

methamphetamine from WRIGHT.  WRIGHT replied by telling CS#1 that WRIGHT needed to call someone first, and would call CS#1 right back.

31. At approximately 12:38 p.m., an outgoing call from TT#1 was made to telephone number 916-226-7541, a telephone known to be used by MCDOWELL and referred to as "PT#1."  This call between TT#1 and PT#1 lasted four minutes and eight seconds in duration.  After this call, WRIGHT, using TT#1, called CS#1 back at approximately 12:43 p.m.  This telephone call was recorded and the contact was verified through toll records.  WRIGHT started the conversation by saying, "I just talked to him . . . and . . . a...for the good stuff like you been getting, he wants sixty two."  WRIGHT continued by saying, "he said, if you get more than one it drops."  CS#1 replied that the price was too high and would call WRIGHT back to confirm the deal.

    a.  On July 17, 2014, between 12:33 p.m. and 12:43 p.m, the only outgoing call made by TT#1 was to PT#1.  TT#1 did receive one incoming telephone call during this time period but the call lasted only eight seconds in duration.  Based on the short duration, I do not believe any contact was made during the incoming telephone call.  Accordingly, I believe that WRIGHT contacted MCDOWELL immediately after talking to CS#1 because MCDOWELL is the source of drug supply for WRIGHT.

32. Through my training, experience, discussion with CS#1, and my familiarity with the case, I believe that WRIGHT in the above two telephone calls originally provided CS#1 with a price of $5,000 for one pound of methamphetamine.  I also believe that once CS#1 ordered one pound of methamphetamine, WRIGHT had to confirm the price with WRIGHT's methamphetamine source of supply, MCDOWELL, and that the source of supply wanted to charge $6,200 for one pound of methamphetamine.

33. Later on July 17, 2014, CS#1 exchanged several text messages with WRIGHT, using TT#1, to continue to negotiate the price of one pound of methamphetamine, at the direction of agents.  Agents obtained copies of the text messages because CS#1 took screen shots of the text messages and provided them to agents.  These text contacts were subsequently confirmed through telephone toll records for TT#1.  This text message exchange occurred between approximately 3:20 p.m. and 3:48 p.m. and is provided below:

> CS#1:  I told him and explained your number but the must the most that we can pay for one at this time is 5500, talk to your guy if he can do it for that price. Txt me to let me know cause I'll be on the road.
> TT#1:  Ok I'm going to call now
> TT#1:  He said ok

11

CS#1:  Great, thank you!  I'll see you on wed then, I'll call you tue to confirm
with you.
TT#1:  Ok
TT#1:  Ok

34. During the above text message exchange, toll analysis of TT#1 shows that two
outgoing telephone calls were made to PT#1 between 3:20 p.m. and 3:48 p.m. on July
17, 2014. No other outgoing telephone calls were made by TT#1 during the
aforementioned time period.

35. I believe in the above text message exchange WRIGHT confirmed with CS#1 that
WRIGHT would sell one pound of methamphetamine to CS#1 for $5,500.  I also
believe the message from WRIGHT that stated, "Ok I'm going to call now" indicates
that WRIGHT had to contact his methamphetamine source of supply, MCDOWELL,
to confirm the price of $5,500.  This is corroborated by WRIGHT's subsequent call to
PT#1.

36. On Tuesday, July 22, 2014, CS#1 made a recorded telephone call to WRIGHT at
TT#1.  The telephone contact with TT#1 was verified through toll records.  During
this call WRIGHT answered the telephone and CS#1 confirmed the location and time
where WRIGHT and CS#1 would meet for the anticipated purchase of
methamphetamine on July 23, 2014.

37. Subsequently, on July 23, 2014, CS#1 met with WRIGHT at a restaurant in
Sacramento.  During the course of the meeting, CS#1 purchased approximately one
pound of methamphetamine from WRIGHT in exchange for $5,500 of DEA
prerecorded buy money.  The conversation between CS#1 and WRIGHT was recorded
during this controlled purchase and the Investigating Agencies conducted surveillance
before, during, and after the meeting.  CS#1 was searched by agents prior to and after
the meeting with WRIGHT for contraband and currency, with negative results.
During the meeting between WRIGHT and CS#1, WRIGHT initially discussed that he
could ship methamphetamine to CS#1 if CS#1 wanted and also that WRIGHT had
shipped drugs before.  WRIGHT and CS#1 also discussed heroin and WRIGHT
indicated he would obtain prices of heroin for CS#1.  WRIGHT also indicated he was
not the source of supply of drugs by saying, "I'm just middle-manning."

38. While meeting with CS#1, WRIGHT made several telephone calls.  These calls were
made in the presence of CS#1, and thus WRIGHT's side of the conversation was
recorded on a concealed transmitter/recorder worn by CS#1.  Two of the calls
indicated that WRIGHT was checking on the time his source of supply for the one
pound of methamphetamine would arrive.  Toll analysis of WRIGHT's telephone,

TT#1, showed that WRIGHT was in contact with PT#1 during the telephone calls made by WRIGHT in front of CS#1. Further analysis of toll records for TT#1, indicate that WRIGHT was not only in contact with PT#1 during the meeting with CS#1, but before and after as well.

39. During the meeting with CS#1, WRIGHT was observed briefly leaving the restaurant and meeting with Khanajee LEE in the restaurant's parking lot. Just prior to meeting with WRIGHT surveillance agents observed LEE arrive and park in the restaurants parking lot, LEE arrived alone. While meeting with LEE, surveillance agents observed WRIGHT obtain a black plastic bag from the front passenger seat of LEE's car and then return to the restaurant to resume his meeting with CS#1.

40. Inside the restaurant, CS#1 then gave WRIGHT $5,500 in DEA buy money in exchange for approximately one pound of a white crystal substance contained in the black plastic bag. The white crystal substance was later field tested by agents and showed a positive result for the presence of methamphetamine. Agents sent the suspected methamphetamine to the laboratory for drug and finger print analysis. The analysis results are still pending.

41. While CS#1 was conducting the transaction with WRIGHT, agents kept the restaurant parking lot and LEE under observation. Agents observed MCDOWELL arrive and park in the area of LEE's vehicle. Immediately after the transaction with CS#1, WRIGHT was observed entering MCDOWELL's vehicle. MCDOWELL and WRIGHT met inside MCDOWELL's vehicle for less than two minutes. After meeting inside MCDOWELL's vehicle, WRIGHT and MCDOWELL were observed meeting with LEE. Shortly thereafter, agents observed WRIGHT leave the area alone. Agents continued to follow MCDOWELL and LEE, who initially drove in separate vehicles, but in tandem. During the period of observation, agents observed LEE leave her vehicle at a car rental business, after which, MCDOWELL drove together in the same vehicle. Agents observed MCDOWELL and LEE for several hours and stop at various stores until they arrived at 8241 Rivallo Way, Sacramento, California, which is believed to be the residence of LEE and MCDOWELL at the time of the July 23, 2014, controlled purchase of methamphetamine. MCDOWELL and LEE have since moved and are no longer associated with the address 8241 Rivallo Way.

### *September 5, 2014, Controlled Purchases of Methamphetamine*

42. Prior to September 5, 2014, and at the direction of agents, CS#1 organized the controlled purchase of approximately four ounces of methamphetamine and a sample of heroin from WRIGHT. CS#1 organized this controlled purchase by contacting

WRIGHT at TT#1.  The calls between CS#1 and WRIGHT were recorded and verified through telephone toll records.

43. On September 5, 2014, CS#1 met with WRIGHT at a specified time and place in Sacramento, California.  Before meeting with WRIGHT agents searched CS#1 for contraband and currency with negative results.  Furthermore, agents provided CS#1 with a concealed recorder/transmitter to be worn by CS#1 during the controlled purchase.

44. During the face to face meeting between CS#1 and WRIGHT, WRIGHT received an incoming telephone call.  WRIGHT answered the telephone call in front of CS#1.  During the call WRIGHT asked the person on the other end of the call if they had arrived yet.  WRIGHT also asked the person on the other end of the call if they had some "Jason" with them.  WRIGHT concluded the telephone conversation by indicating to the person on the other end of the line that WRIGHT remembered he had some "Jason" in his car.  WRIGHT conducted this conversation in front of CS#1 and WRIGHT's side of the conversation was recorded by the concealed recorder worn by CS#1.  WRIGHT then indicated to CS#1 that WRIGHT had a sample quantity of heroin for CS#1 in WRIGHT's vehicle.

    a. On August 12, 2014, the Honorable District Judge John A. Mendez, Eastern District of California, signed a court order authorizing the interception of wire and electronic communications for TT#1 for a period of thirty days.  During the intercept of conversations over TT#1, agents identified that MCDOWELL and WRIGHT use coded language to refer to types of illegal drugs and also the quantity of drugs.  Specifically, agents have identified that WRIGHT and MCDOWELL have used the word "Jason" to refer to heroin.

45. Approximately four minutes after the first telephone call, WRIGHT received a second incoming telephone call, WRIGHT answered the call in front of CS#1.  During this call, WRIGHT asks the person on the other end if they have arrived.  WRIGHT quickly concludes the conversation by asking the person on the other end to let WRIGHT know when they arrive.  WRIGHT conducted this conversation in front of CS#1 and WRIGHT's side of the conversation was recorded by the concealed recorder worn by CS#1.

46. Several minutes after the second telephone call, CS#1 indicated that WRIGHT received a text message or an incoming telephone call on WRIGHT's telephone.  WRIGHT did not answer this call, but instead excused himself from the meeting with CS#1.  WRIGHT indicated that he would return shortly.

47. At about the same time, agents conducting surveillance of the controlled purchase, observed MCDOWELL arrive in the parking lot of the controlled purchase location driving a Ford SUV, bearing California license plate 6TFA512. Agents then observed WRIGHT walk up to the driver's window of the Ford SUV and meet with MCDOWELL for a period of no more than two minutes, prior to MCDOWELL even parking in the lot. Agent's later identified that LEE was the front seat passenger of the Ford SUV and a juvenile female was present in the vehicle during the time MCDOWELL met with WRIGHT.

48. Agents then observed, WRIGHT return towards CS#1. CS#1 indicated when WRIGHT returned WRIGHT handed CS#1 the requested four ounces of methamphetamine in exchange for $1,500 in DEA pre-recorded funds.

49. Agents kept MCDOWELL, LEE, the Ford SUV, and the parking lot under observation after their arrival. After the Ford SUV was parked, LEE was observed walking from the vehicle with the juvenile female towards some nearby shops. MCDOWELL was observed walking through and standing near the parking lot looking around carefully and talking on a cell phone.

50. A short time after WRIGHT returned to CS#1, CS#1 indicated that WRIGHT received another incoming telephone call. WRIGHT answered the call and spoke briefly to the person on the other line, telling the person on the other end of the conversation to just hold on and that WRIGHT would "be right there." WRIGHT conducted this entire telephone call in front of CS#1 and WRIGHT side of the conversation was recorded by a concealed recorder worn by CS#1. Immediately after hanging up the phone, WRIGHT told CS#1, "Let me take him his money then we will walk to my car and get you the sample." CS#1 indicated WRIGHT briefly walked outside away from CS#1.

51. At about the same time, surveillance agents observed WRIGHT meet with MCDOWELL in the parking lot of the meeting location. WRIGHT met with MCDOWELL for approximately five minutes, at which time WRIGHT returned to meeting with CS#1 and MCDOWELL was observed returning to the FORD SUV. LEE and the juvenile female arrived back to the Ford SUV at about the same time as MCDOWELL. All three re-entered the Ford SUV and were driven out of the area by MCDOWELL. During this controlled purchase, WRIGHT was only observed meeting with CS#1 and MCDOWELL.

52. After WRIGHT returned to CS#1, WRIGHT and CS#1 went to WRIGHT's vehicle. At WRIGHT's vehicle, WRIGHT provided CS#1 a small sample of suspected heroin.

15

CS#1 then left the controlled purchase alone, followed by surveillance agents. WRIGHT also drove from the area of the controlled purchase at which time surveillance of WRIGHT was discontinued.

53. After the controlled purchase, agents obtained the suspected methamphetamine and heroin from CS#1. CS#1 was searched again by agents for contraband and currency with negative results. The methamphetamine was field tested by agents. The field test indicated a presumptive positive result for the presence of methamphetamine. A field test was not completed on the suspected heroin, due to the small size of the sample. Both the suspected methamphetamine and heroin have been sent to the DEA laboratory and agents are awaiting the results of analysis.

54. Agents conducted telephone toll analysis of telephone number 916-544-4872, a second telephone identified as being used by MCDOWELL and referred to as "TT#2," for the time period of the above controlled purchase. Toll analysis revealed that TT#2 was in contact with TT#1 before, during, and after the above controlled purchase of methamphetamine. Furthermore, toll records indicated that TT#2 was in contact with TT#1 at approximately the same times WRIGHT received the aforementioned telephone calls in front of CS#1. Based on the above, I believe that while meeting with CS#1, WRIGHT received the above telephone calls on TT#1 from MCDOWELL using TT#2. Furthermore, I believe MCDOWELL supplied the methamphetamine sold to CS#1 by WRIGHT and the telephone calls between TT#1 and TT#2 assisted in the coordination of the delivery of the methamphetamine to WRIGHT from MCDOWELL in the parking lot outside the meeting with CS#1.

*Interception of Telephone Calls and Electronic Communication related to WRIGHT's and MCDOWELL's Cellular Telephones*

55. As noted above, on August 12, 2014, the Judge Mendez signed a court order authorizing the interception of wire and electronic communications for TT#1 for a period of thirty days. The interception of TT#1 was initiated on August 13, 2014 and was discontinued on August 25, 2014.

56. During the interception of TT#1, agents were able to intercept several telephone calls and electronic communications of WRIGHT, MCDOWELL, and others related to the distribution of drugs. Below is an example of the communications of WRIGHT and MCDOWELL over TT#1.

57. On August 18, 2014, at the direction of agents, CS#1 contacted WRIGHT at TT#1. During the conversation with WRIGHT, CS#1 asked WRIGHT how many pounds of

16

methamphetamine CS#1 would have to purchase in order to get a price of $3500 per pound. WRIGHT indicated to the CS he would have to call someone. Directly after WRIGHT's conversations with CS#1, WRIGHT called MCDOWELL (Call Session# 1738) and discussed the price of methamphetamine for CS#1 and how MCDOWELL and WRIGHT could make money from a drug deal with CS#1. Below is a transcript of the call between WRIGHT and MCDOWELL:

**Call# 1738**

| NAME | TRANSCRIPTION |
|------|---------------|
| | [Telephone rings] |
| WRIGHT: | [Voices in the background]. |
| MCDOWELL: | What's up [U/I]? |
| WRIGHT: | Hey, what's up, bro?  Hold on, hey Bliss. |
| MCDOWELL: | Yeah. |
| WRIGHT: | Hey, uh the Mexicano, the Mexicano hittin you right? |
| MCDOWELL: | Yeah. |
| WRIGHT: | He wanna know uh how many do he gotta get to get a pri—how many of the wifey do he gotta get?  What's up with, wifey?  He wanna know how many pizounds [sic] do he gotta get to get the price break? |
| MCDOWELL: | How many, how many, how many he trying to get? |
| WRIGHT: | He wanna know how many do he have to buy to get a price break? |
| MCDOWELL: | Uh, I don't know [U/I]. |
| WRIGHT: | No, nigga. |
| MCDOWELL: | [Laughs]. |
| WRIGHT: | [Laughs]. |
| MCDOWELL: | [U/I], you know what I'm saying?  How we, how we going to do it? |
| WRIGHT: | So what you wanna, what you wanna say?  Five or more? |
| MCDOWELL: | Five P's or more? |
| WRIGHT: | Yeah. |
| MCDOWELL: | Yeah, just say, say three. Say at least three and a half.  No, say three or four. |
| WRIGHT: | I'm gonna say five. |
| MCDOWELL: | Yeah, go ahead say five. |
| WRIGHT: | Okay. |

17

| MCDOWELL: | Alright, you still haven't talked to Jay? |
|---|---|
| WRIGHT: | No, it's, it's going straight to voicemail, bro. I'm gonna have to–[Voices overlap] |
| MCDOWELL: | [U/I]. |
| WRIGHT: | Switch up because he uh, he uh, uh, uh, uh, uh he ain't gonna pay that–this phone bill. It's due on Friday, so ima switch my shit up, man. |
| MCDOWELL: | Hell yeah. Yes– |
| WRIGHT: | My shit uh– |
| MCDOWELL: | [U/I]. |
| WRIGHT: | So look–hello? |
| MCDOWELL: | Yeah, I'm right here. |
| WRIGHT: | So look, so he wanna, he wanna get it downer. Thirty-five a peezy, so we only gone put–this time we cutting so we, we could come out winning this time. You feel me? |
| MCDOWELL: | Yeah. |
| WRIGHT: | But we only gonna put four. So that's three, six, nine–or three or four. Well whatever you–yeah we ain't doing the halves to do [sic]. Do not put halves and we only putting four. |
| MCDOWELL: | Yeah. |
| WRIGHT: | So that's–[Voices overlap] |
| MCDOWELL: | [U/I]. |
| WRIGHT: | Huh? |
| MCDOWELL: | That's [U/I] last time. |
| WRIGHT: | Oh, well you cheated me out some money then. |
| MCDOWELL: | No, I didn't. |
| WRIGHT: | Bullshit, yes I did–yes we did because we was supposed to split. Because you said you put eight. |
| MCDOWELL: | Okay, that's why I'm putting in eight [U/I] them eight. |
| WRIGHT: | Come on, man–[Voices overlap] |
| MCDOWELL: | [U/I]. |
| WRIGHT: | You some [U/I]. |
| MCDOWELL: | Nah, nah I wouldn't do that. I wouldn't do that, I promise you. He didn't know about that, you could see it because it wasn't all at the bottom. |
| WRIGHT: | Yeah. |
| MCDOWELL: | So neither would be–I do–you could be right there when I do it. |

| WRIGHT: | So big time only put four and then me and you split the rest. Unless you, unless you can do it with two? |
|---|---|
| MCDOWELL: | So you mean just put–[U/I] same shit. That's four, eight, ten. So you said to put four instead, instead of twelve? |
| WRIGHT: | No, we gone split more than twelve. |
| MCDOWELL: | No, I said twelve, twelve zips. After, after pocket though I'm saying twelve zips. |
| WRIGHT: | Off each one. |
| MCDOWELL: | Yeah, you said, you said put four in each P. |
| WRIGHT: | Four in each one, that's it. So all we do–[Voices overlap] |
| MCDOWELL: | [U/I]. |
| WRIGHT: | All we do, all we do is take, all we do is take that twelve off the top of each one. And me and you split the rest. |
| MCDOWELL: | Oh yeah, we'll win like a motherfucker. |
| WRIGHT: | That's what I'm saying, that's what I wanted you to do the last time. |
| MCDOWELL: | I know but remember that you didn't tell me quick enough. Nigga, that was my first time really ever doing that. |
| WRIGHT: | Yeah man–[Voices overlap] |
| MCDOWELL: | [U/I] that was my first time ever did–how to know how to mix and match it. |
| WRIGHT: | Okay. |
| MCDOWELL: | You wanna put–out of a whole p you wanna put four [U/I] where all the rest at? |
| WRIGHT: | Yes. |
| MCDOWELL: | Alright, we gone eat on that one. |
| WRIGHT: | Yeah. |
| MCDOWELL: | That's what [U/I]. |
| WRIGHT: | I'm about to call him, boy. You know I'm leaving tonight, I'm leaving I wont be back until Sunday. So I'm gonna have it set up for next week. I'm gonna have him–I'm gonna be talking with him. But I'm about to start–yeah don't trip I'm gonna be talking me and him and then uh go from there. |
| MCDOWELL: | You sure have a lot of power moving that tail. [U/I] gonna do it? |
| WRIGHT: | Man, I'm, I'm you know–I'm just looking at it. |
| MCDOWELL: | What you been doing, packing? |
| WRIGHT: | Yup. |
| MCDOWELL: | Yeah, how long it take to drive out there? |

19

| WRIGHT: | Uh twenty-eight hours but this time I'm not the only driver.  So we gone go straight through. |
| MCDOWELL: | Yeah, okay we [U/I]. Yeah [U/I]. |
| WRIGHT: | [U/I] there's three drivers all together.  So it's gonna be me and two other drivers.  So, it's good. |
| MCDOWELL: | Yeah, yeah he gonna be alright. |
| WRIGHT: | Yeah, so I'm about to line it up right now and then I'll have it lined up for uh–I'll tell him next week. |
| MCDOWELL: | Alright, so, so you gonna miss the first Jamboree, huh? |
| WRIGHT: | Yeah. |
| MCDOWELL: | Damm. |
| WRIGHT: | [U/I] hold on let me see something because he trying to, he wanna know–okay because look we gotta think about it.  Because he wanna know, he wants to know, he wants to get them for thirty-five a peezy, right? |
| MCDOWELL: | Make it, make it real. It's like, like we'll do them for thirty-seven.  Just say something like that, let them know they in the game type of shit. |
| WRIGHT: | Okay. |
| MCDOWELL: | Or say thirty-eight. Just say–he already know what we doing so [U/I] say a number.  Just be like thirty-eight, just say thirty-eight.  Say we'll do [U/I] best for you. |
| WRIGHT: | Okay. |
| MCDOWELL: | Because if he say thirty-five and we say yeah thirty-five–you know what I mean? We say like okay well we can't–might do thirty-seven or thirty-eight or thirty-six. Just say something like that. |
| WRIGHT: | Okay, I'm about to tell him right now.  I'll call you back and let you know when– what'd, what'd he say. |
| MCDOWELL: | Alright. |
| WRIGHT: | Alright, gone. |
| | [End of call] |

58. Due to the close proximity of Call# 1738 to the recorded telephone calls between WRIGHT and CS#1, I believe that WRIGHT and MCDOWELL are discussing how they plan to substituted some of the methamphetamine anticipated to be sold to CS#1 in order to make more money off the deal.  This is a process commonly referred to as "cutting" which allows drug dealers to make more money while using the same amount of actual drugs through the replacement of some, but not all, of the actual drug with a cutting agent.  Specifically, when WRIGHT says, "So big time only put four and then me and you split the rest.  Unless you, unless you can do it with two?" and

20

when MCDOWELL replies, "Yeah, you said, you said put four in each P." Agents believe that WRIGHT and MCDOWELL are planning to put four ounces of methamphetamine in each pound, "P," purchased by CS#1 and will keep the rest for themselves. Also during this call, WRIGHT uses the word "wifey" to refer to methamphetamine. Agents believe "wifey" to be code for methamphetamine because CS#1 has conducted controlled purchases of cocaine and methamphetamine from WRIGHT in the past, but methamphetamine is the only drug CS#1 has purchased in pound quantities and agents know that large quantities of cocaine are typically measured in kilograms.

59. On November 4, 2014, the Honorable District Judge John A. Mendez, Eastern District of California, signed a court order authorizing the interception of wire and electronic communications for telephone number 916-554-4410, used by MCDOWELL and referred to as TT#3, for a period of thirty days. The interception of TT#3 was initiated on November 5, 2014 and was discontinued on November 13, 2014.

60. During the interception of TT#3, agents were able to intercept several telephone calls and electronic communications of WRIGHT, MCDOWELL, and others related to the distribution of drugs. Below is an example of the communications of MCDOWELL over TT#3.

61. On November 9, 2014, MCDOWELL is in contact with a male, referred to as "MIKE" over TT#3 (Call# 952). At this time, agents have been unable to identify the telephone number used by MIKE. Below is a transcript of the telephone conversation:

**Call# 952**

| | |
|---|---|
| MCDOWELL: | Hold on, hold on. [Call waiting] Hello? |
| MIKE: | Yeah? |
| MCDOWELL: | [U/I]. I need [U/I] I'm gonna get a number [U/I]. [U/I] open shit–[Voices overlap] |
| MIKE: | [U/I]–[Voices overlap] |
| MCDOWELL: | [U/I] I got to [U/I]– [Voices overlap] |
| MIKE: | [U/I] I, I spill some in my fucking hand, when I, when I got it. |
| MCDOWELL: | Yeah– [Voices overlap] |
| MIKE: | That's why I said before he had left, "Jason go get the scale [U/I]". So he could hurry up and put it in the bag. |
| MCDOWELL: | [U/I]. |
| MIKE: | And it's eleven point eight, man. And I didn't even touch this shit. |
| MCDOWELL: | Eleven point, with the bag? |
| MIKE: | Yeah–nah, it was twelve point eight with the bag. It's eleven point eight, and so [U/I], and it's half of bag anyways. So I mean, shit. |

| MCDOWELL: | How much you missing? |
|---|---|
| MIKE: | [Clears throat] Eleven point eight from, uh, fourteen. Shit, damn near two grams. Eleven point eight, eleven point eight. Yeah, about two grams because it's a half a bag so, gonna be point two, O, point three O. |
| MCDOWELL: | [U/I] crazy, man.  All right, I'll bring it to you. |
| MIKE: | And, then, uh, he got your bread, though. |
| MCDOWELL: | I know. He owes you that part. |
| MIKE: | Yeah, yeah. |
| MCDOWELL: | [U/I]–[Voices overlap] |
| MIKE: | [U/I], I got to hurry up I'm about to go to a family reunion. |
| MCDOWELL: | [Laughs] |
| MIKE: | [U/I], no [Stutters]. For reals and I started laughing. [U/I]–[Voices overlap] |
| MCDOWELL: | [U/I] going, going [U/I]. That nigga crazy man.  He no–he [U/I] Tutu said it yesterday too. [U/I] I didn't say [U/I]–[Voices overlap] |
| MIKE: | [U/I]–[Voices overlap] |
| MCDOWELL: | I just [U/I]. I didn't say nothing cause I don't do that. |
| MIKE: | Yeah, yeah. |
| MCDOWELL: | [U/I], you know he gonna deny it anyway. |
| MIKE: | Yeah. That shit, that shit is eleven point eight. Cause I, I was like, "Jason." I had to make sure that Jason had it on the right part, know you, on the right thing on the scale. I checked it myself. And it was eleven eight– [Voices overlap] |
| MCDOWELL: | Yeah. I'm glad you did it, though, you know I don't do that [U/I], ever. |
| MIKE: | No, and I know. The [U/I] we had already talked about the dusty part. It was a little bit of dusty , too, I [U/I]–[Voices overlap] |
| MCDOWELL: | [U/I]–[Voices overlap] |
| MIKE: | When he, when he gave it to me the, the dusty part fell in my hand. I was like, "what the fuck"–[Voices overlap] |
| MCDOWELL: | [U/I] trying to [U/I] a g of that cause I know that everything was selling for like a g. Got a [U/I] with those cards and shit. |
| MIKE: | So, yeah [U/I]. I mean that was fine but when, when it spilled down on my–I was like "uh, Jason don't, don't weight it out." |
| MCDOWELL: | Yeah. Well, he, he knows–I mean by [U/I] the bag is not even open. I tried to tied it [U/I]. |
| MIKE: | I know how you tie it and shit. |
| MCDOWELL: | Yeah. |
| MIKE: | That's the whole thing. We have to [U/I] open and shit, or, or cut it. You know what I'm saying? I already know. |
| MCDOWELL: | All right–[Voices overlap] |
| MIKE: | That's why, that's why, you can just tell he [Stutters] [U/I] out so still look like it a knot, but when he gave it to me, that's when, shoop [sic]. |
| MCDOWELL: | Yeah. Wow. All right. |
| MIKE: | All right, man. |

| [End of call] |
|---|

62. During the above call, I believe that MCDOWELL and MIKE are discussing the weight of suspected cocaine recently received by MIKE from MCDOWELL. In a subsequent call between MIKE and MCDOWELL (Call# 953), MIKE refers to having "coke on his hand", I know that "coke" is a common term used to refer to cocaine. In the above call, MIKE indicates the weight he received "eleven point eight from fourteen." I believe that MIKE is complaining he was not given approximately two grams he had paid for. Later in the conversation, MCDOWELL states, "Alright, I'll bring it to you," indicating MCDOWELL will bring MIKE the missing two grams. I believe that MCDOWELL and MIKE are discussing that an unknown third party that delivered the drugs to MIKE is stealing some of the drugs prior to delivery.

### MCDOWELL's connection to 8299 Gwinhurst Circle, Sacramento, California

63. During the course of this investigation, at MCDOWELL has moved at least two times. Through surveillance, telephone call interceptions over TT#3, utility information, and GPS data, I believe MCDOWELL and LEE currently reside at 8299 Gwinhurst Circle, Sacramento, California.

    a. LEE is believed to be McDOWELL's girlfriend. And, as discussed above, LEE accompanied McDOWELL to the July 23, 2014 and September 5, 2014 drug deals.

64. The court order for TT#3, not only allowed agents to obtain wire and electronic communication for TT#3, but also authorized agents to obtain GPS location information for TT#3, during the period of interception. The GPS information obtained for TT#3 indicated with very close proximity that MCDOWELL was on a daily basis at 8299 Gwinhurst Circle, Sacramento, California. The GPS data showed that MCDOWELL and TT#3 were at 8299 Gwinhurst Circle at all hours of the day and night. On November 11, 2014, MCDOWELL stopped using TT#3, but I believe MCDOWELL continued to reside at 8299 Gwinhurst Circle.

65. During the interception of MCDOWELL over TT#3, MCDOWELL made several references to the general location of his residence. On November 7, 2014, during Call #524, MCDOWELL makes an outgoing telephone call to telephone number 916-524-3115, used by a male known only as "SWANIGAN," and provides SWANIGAN information with the general location of MCDOWELL's residence. MCDOWELL states during the conversation, "I live across from Monterey Trail." During surveillance, I found that 8299 Gwinhurst Circle is within approximately one mile of

Monterey Trail High School.  While not directly across the street from Monterey Trail High School, 8299 Gwinhurst Circle is in very close proximity.

66. On November 7, 2014, an agent conducted surveillance in the area of 8299 Gwinhurst Circle.  During the surveillance, a black Audi was observed parked in the driveway of 8299 Gwinhurst Circle, bearing California license plate 6AOK39.  The black Audi is registered through California DMV to Khanajee Y LEE at 4801 Laguna Blvd 105, Elk Grove, California.  I believe 4801 Laguna Blvd 105 Elk Grove, California is not a current address for LEE.

67. On the same date, MCDOWELL made two separate telephone calls identified as Call# 571 and Call# 572.  During these conversations, MCDOWELL states to the other party, "I'm at the house."  At about the same time, an agent observed MCDOWELL standing in the open garage of 8299 Gwinhurst Circle, alone, and talking on a cellular telephone.

68. During December 2014 and January 2015, agents have conducted surveillance of 8299 Gwinhurst Circle.  During those surveillances, agents identified vehicles parked in the driveway of 8299 Gwinhurst Circle that are associated with MCDOWELL and LEE. Specifically, on several occasion agents observed the Ford SUV mentioned above during the September 5, 2014 controlled purchase of methamphetamine. The Ford SUV currently bears the license plate 6GDU010 and is registered to Kanajee Yanee McDowell 8178 Center Parkway Apt. 39, Sacramento, California.  A search of California DMV records the Ford SUV was previously issue license plate 6TFA512 and was recently reregistered.

69. Also during surveillances on December 10, 2014, and January 6, 2015, agents observed MCDOWELL leaving and entering the 8299 Gwinhurst Circle, through the front door without knocking.

70. On January 12, 2015, a law enforcement customer information request was submitted to the Sacramento Municipal Utility District (SMUD) regarding 8299 Gwinhurst Circle.  A SMUD representative provided information that the utilities at 8299 Gwinhurst Circle are registered in the name Khanajee Y Lee as of September 19, 2014 and are still current.

***WRIGHT's connection to 5541 Crystal Hill Way, Sacramento, California.***

71. On April 28, 2014, the Honorable Judge Carolyn K. Delaney, Eastern District of California, authorized agents to obtain GPS data for TT#1, a telephone known to be

used by WRIGHT for a period of thirty days. The GPS data for TT#1 indicated with
close proximity that WRIGHT frequented the residence 5541 Crystal Hill Way,
Sacramento, California during April and May 2014. The GPS information for TT#1
showed that WRIGHT stayed overnight at 5541 Crystal Hill Way, several nights
during the thirty day time period.

72. During the above mentioned May 29, 2014 controlled purchase of methamphetamine,
WRIGHT was observed by agents leaving from 5541 Crystal Hill Way prior to the
controlled purchase and returning to 5541 Crystal Hill Way after the controlled
purchase was completed.

73. On January 12, 2015, a law enforcement customer information request was submitted
to the Sacramento Municipal Utility District (SMUD) regarding 5541 Crystal Hill
Way, Sacramento, California.  A SMUD representative provided information that the
utilities at 5541 Crystal Hill Way are registered in the name Carrie Ann Wright, as of
May 1, 2013, and are still current. I believe Carrie Ann Wright is a family member of
WRIGHT.

74. On June 24, 2014, agents established surveillance of 5541 Crystal Hill Way at
approximately 7:30 a.m. At approximately 9:00 a.m., agents observed WRIGHT exit
5541 Crystal Hill Way and retrieve empty trash cans from the street and place the cans
by the house and re-enter the house. At approximately 9:45 a.m., a surveillance agent
observed WRIGHT exit 5541 Crystal Hill Way and turn off the lawn sprinklers for the
residences front yard. At approximately 9:56 a.m., a surveillance agent observed the
garage of 5541 Crystal Hill Way open and WRIGHT drive out of the garage and away
from the residence in a silver sedan bearing California license plate 6RUK556.
Agents were able to observe that no other cars were parked inside the garage of 5541
Crystal Hill Way.

75. During the interception of TT#1, agents intercepted several telephone calls between
WRIGHT and Michael OCHOA. OCHOA was identified as a drug user who
purchased drugs on a frequent basis from WRIGHT. On August 16, 2014, during a
series of intercepted calls I believe WRIGHT organizes providing OCHOA with
drugs, and in exchange OCHOA will provide WRIGHT's mother-in-law with a ride.
The series of calls are identified as Call# 757, 778, 814, and 825 during the
interception of TT#1.

76. During Call #778, which took place at approximately 12:34 p.m., WRIGHT says "I'm
going to need you to take my mother in law somewhere.  I'm about to pick up the shit
for you.  Can you do it or what?"  OCHOA replies, "Can I get the stuff first?"  and

WRIGHT replies "Yes" and instructs OCHOA where to meet WRIGHT by saying "Go to my mom's house right now." Based on my knowledge of this case, I believe that when WRIGHT says "shit" and OCHOA uses the word "stuff" they are speaking in vague terms about heroin. Through the interception of TT#1 and TT#3, I was able to identify that OCHOA contacts WRIGHT and MCDOWELL on a frequent basis and often uses code or vague language on the telephone to purchase drug user quantities of heroin. Because of the previously established relationship between OCHOA and WRIGHT and prior drug transactions OCHOA and WRIGHT are able to understand the meaning of vague terms used when discussing drugs.

77. Agents established surveillance in area of 5541 Crystal Hill Way in connection with the above series of telephone calls. At approximately 1:05 p.m., a surveillance agent observed OCHOA arrive and park on the street in front of 5541 Crystal Hill Way. At approximately 1:06 p.m., a surveillance agent observed a vehicle occupied by WRIGHT approach 5541 Crystal Hill way and the garage door of 5541 Crystal Hill Way open. The vehicle occupied by WRIGHT then drove into the open garage of 5541 Crystal Hill Way. The garage remained open.

78. At approximately 1:08 p.m., the vehicle occupied by WRIGHT left the area and the garage door was closed. At approximately 1:09 p.m., OCHOA left the area. Although, surveillance agents were unable to observe OCHOA and WRIGHT meeting at 5541 Crystal Hill Way, based on the above mentioned intercepted telephone calls, utility information, and the short duration that WRIGHT and OCHOA where at 5541 Crystal Hill Way, I believe that 5541 Crystal Hill Way is WRIGHT's mothers house and WRIGHT provided OCHOA with drugs at the 5541 Crystal Hill Way.

79. On December 10, 2014, the Honorable Magistrate Judge Carolyn K. Delaney authorized agents to obtain GPS data for telephone number (917) 943-6802, hereinafter referred to as "TT#4," a telephone believed to be used by WRIGHT for a period of 30 days.

80. On December 30, 2014, at approximately 10:20 a.m., a surveillance agent established surveillance in the area of 9340 West Stockton Blvd, the location indicated by the telephone GPS data. At about the same time, the surveillance observed WRIGHT walk from a business and enter a brown SUV bearing California license plate 7GFZ816 and drive away from the business.

81. Several minutes later at approximately 10:36 a.m., a surveillance agent established surveillance in the area of 5541 Crystal Hill Way and observe the brown SUV bearing California license plate 7GFZ816 parked in the open garage of 5541 Crystal Hill Way.

At about the same time, the GPS data for telephone number TT#4 indicated that WRIGHT was at 5541 Crystal Hill Way.

82. A review of the GPS data obtained for TT#4 indicated that between December 12, 2014 and January 10, 2015, WRIGHT frequented 5541 Crystal Hill Way at hours during the day and night. The GPS data also indicated on many nights WRIGHT remained overnight at the residence.

83. Based on the above information, I believe WRIGHT uses 5541 Crystal Hill Way as his main residence and lives there with his mother.

### WRIGHT's Connection to Telephone Number 917-943-6802 (TT#4).

84. During the period of interception for TT#3, several telephone calls and text messages between the telephone number TT#4 and TT#3 were intercepted. The intercepted telephone calls indicated that WRIGHT was the user of telephone number TT#4.

85. On November 6, 2014, during the period of interception for TT#3, MCDOWELL received and incoming call from the TT#4, this call is identified as Call# 253. Through my familiarity with this case, a call comparison with several intercepted call recorded during the interception of WRIGHT's previous telephone (TT#1), and listening to recorded conversations between CS#1 and WRIGHT, I immediately recognized WRIGHT's voice as the user of the TT#4. Also during this call, MCDOWELL refers to the user of the TT#4 as "Jessie," WRIGHT's first name.

   a. During Call# 253. MCDOWELL and WRIGHT greet each other. WRIGHT then asks about MCDOWELL's location in an effort to meet up. MCDOWELL then indicates to WRIGHT that WRIGHT was late in calling MCDOWELL. MCDOWELL continues by saying, "I'm glad I got rid of that I had on me, cause I'd have been riding with all the things." MCDOWELL states further, "I'm going to go grab it give me like thirty minutes. Where you going to be at?" WRIGHT indicates that WRIGHT will be in the area of Laguna.

   b. Both MCDOWELL and WRIGHT were intercepted during the interception of WRIGHT's previous telephone, TT#1. During the interception of WRIGHT's previous telephone, WIRGHT and MCDOWELL often used coded and vague language to refer to drugs and their drug trafficking activities.

   c. During Call# 253, I believe when MCDOWELL uses the phrases "I'm glad I got rid of that I had on me," and "I'm going to go grab it," MCDOWELL is referring

to an unknown drug that MCDOWELL was planning to give to WRIGHT. Through my familiarity with this investigation I have identified that MCDOWELL and WRIGHT are close associates and contact each other on a frequent basis. WRIGHT and MCDOWELL also meet in person on a regular basis. WRIGHT and MCDOWELL's close association and familiarity allows WRIGHT and MCDOWELL to use and understand vague langue during conversations.

86. On December 5, 2014, the cellular provider for the TT#4 provided the subscriber information in response to an administrative subpoena. TT#4 is subscribed in the name Sha Ruler, 5500 Mack Rd, Sacramento, CA. I know that drug traffickers often subscribe to telephones, utilities, and vehicles in alias names or using the name of a nominee as a method to avoid detection by law enforcement. TT#1, a telephone known to be used by WRIGHT, was subscribed using an alias name. I believe the subscriber information for the TT#4 is either an alias or the name of a nominee, and the TT#4 is used by WRIGHT.

87. Based on all of the information contained within this affidavit, I believe WRIGHT is using the TT#4 to further his drug trafficking activities and contact other drug traffickers.

88. As noted above on December 10, 2014, the Honorable Judge Carolyn K. Delaney authorized agents to obtain GPS data for TT#4 a period of thirty days. During the thirty day period, through surveillance coordinated with the GPS data, agents were able identify that WRIGHT was continuing to use TT#4.

89. On January 13, 2015, agents received updated telephone toll records and subscriber information for TT#4 from the cellular provider. The subscriber information for TT#4 indicated that TT#4 continued to remain active under the same alias name, Sha Ruler, and address, 5500 Mack Rd., Sacramento, California. Toll records for TT#4 show that TT#4 continues to contact the same pattern of telephone numbers and a common call analysis shows that many of the telephone numbers were also contacted by TT#1, which at this time is no longer in use. I believe WRIGHT continues to use TT#4.

90. Based on my familiarity with this case and prior GPS information for WRIGHT's telephones I know that WRIGHT moves around at all hours of the day and night and often uses different vehicles to include rental vehicles for transportation. Based on the approval of this affidavit and requested arrest warrant for WRIGHT, I will also request a renewed authorization to obtain GPS data for TT#4 to assist law enforcement with the location and arrest of WRIGHT.

## Geo-location Authorization Request

91. This Affidavit requests geo-location information (e.g. GPS, E-911 Phase II date) from service provider AT&T concerning (917) 943-6802 (the "Requested Information"), for a period of thirty days.

92. Based on the foregoing, there is probable cause to believe that the Requested Information will lead to evidence regarding the illegal activities described above. The Requested Information is necessary to determine the location of TT#4 so that law enforcement agents can conduct physical surveillance of the user of TT#4 (and any vehicles) in connection with the user's role in the transportation and distribution of methamphetamine. Among other things, this will assist agents in confirming the identity of phone's user, tracking DTO related movements and transactions, and identifying methamphetamine and drug proceeds stash locations.

93. In my training and experience, I have learned that AT&T is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data; and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be ten or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

94. There is "reasonable cause to believe that providing immediate notification of the execution of the warrant may have an adverse result." 18 U.S.C. § 3103a(b)(1). Providing immediate notice to the subscriber or user of the TT#4 would seriously jeopardize the ongoing investigation, as such disclosure would give WRIGHT an opportunity to destroy evidence, change patterns of behavior, notify confederates, or flee from prosecution. Moreover, notification to WRIGHT may alert WRIGHT to the existence of a law enforcement investigation and jeopardize the safety of CS#1.

95. The execution of this warrant will not result in the seizure of any tangible property or any wire or electronic communication (as defined in 18 U.S.C. § 2510). To the extent that the warrant authorizes the seizure of any stored wire or electronic information, that seizure is expressly authorized by 18 U.S.C. § 2703(c)(1)(A).

96. WHEREFORE, pursuant to Rule 41 of the Federal Rules of Criminal Procedure and 18 U.S.C. § 2703(c)(1)(A), it is requested that the Court issue a warrant and Order authorizing agents of DEA to obtain the Requested Information for a period of thirty days.

97. IT IS FURTHER REQUESTED that the Court direct AT&T to assist agents of the DEA by providing all information, facilities and technical assistance needed to ascertain the Requested Information, and further direct AT&T, the service provider for TT#4, to initiate a signal to determine the location of TT#4 on the service provider's network (or networks it services or with which it has service contracts) or with such other reference points as may be reasonably available and at such intervals and times as directed by the law enforcement agent serving the proposed order, and to furnish the technical assistance necessary to accomplish the acquisition unobtrusively and with a minimum of interference with such services as that provider accords the users of TT#4 for a period of thirty days. Reasonable expenses incurred pursuant to this activity will be processed for payment by the Sacramento DEA.

98. IT IS FURTHER REQUESTED that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate TT#4 outside of daytime hours.

99. IT IS FURTHER REQUESTED that, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), the Court authorize notice to be delayed for a period of thirty days after the termination of the monitoring period authorized by the warrant or any extensions thereof.

## **Training and Experience**

Based on my training and experience, and consultations with other federal, state and local law enforcement personnel, I believe the following to be true:

100.    Persons involved in the distribution of controlled substances often maintain at their residences, outbuildings, secondary residences, businesses, and vehicles, quantities of controlled substances, as well as paraphernalia for manufacturing, use, packaging, and distribution of controlled substances. Drug traffickers also maintain

records relating to their trafficking activities in these same places. These records include personal calendars, address/telephone books, and papers reflecting the names, addresses, pager, telephone, and fax numbers relating to their drug trafficking associates. These records can be in written form. Narcotic traffickers also keep stored messages and telephone numbers relating to their trafficking activities within electronic pagers, beepers, and cellular telephones. Further, narcotics traffickers often keep photographs, negatives, video tapes, film, and slides depicting themselves and their associates, as well as their assets and controlled substances. They may also keep electronic equipment used for counter surveillance including scanners, cameras, monitors, and anti-bugging devices.

101.    Premises and vehicles used by individuals involved in drug dealing usually contain articles of personal property showing the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premise or property.

102.    Persons involved in the distribution of controlled substances often maintain records and ledgers listing their trafficking activities in these same places. These records are kept to keep track of the ordering, purchasing, storage, distribution and transportation of controlled substances. After drugs are sold, documentary records and ledgers often remain for long periods of time to memorialize past transactions, track the status of accounts receivable and accounts payable, and to record the names and telephone numbers of suppliers, customers, and co-conspirators. These records are often maintained not only on paper, but also as electronic or digital data in the form of computer hardware and software.

103.    Individuals involved in narcotics trafficking often use telephones, cellular telephones, electronic pagers, beepers, e-mail devices, text messaging, and voice mail and/or answering machines to conduct their business. Individuals involved in narcotics trafficking must often rely on others to obtain drugs and to help obtain, market, distribute, and/or protect drugs. To achieve some of the aforementioned objectives, I am aware that drug distributors will often, among other methods, have a courier transport drugs or drug proceeds or ship controlled substances/drug proceeds through the mail or by common carrier. Evidence related to the identities of these co-conspirators are often maintained in these locations.

104.    Individuals involved in narcotics trafficking often maintain large amounts of U.S. currency to maintain and finance their on-going narcotic business. In addition, assets generated by their drug business are typically kept on-hand by drug dealers to avoid detection by authorities and/or reporting requirements. Individuals involved in narcotics trafficking often attempt to legitimize the source of these profits. In order to

do this, they attempt to secrete, transfer and conceal the money by, among other way: (a) Placing assets in names of nominees to avoid detection, while still maintaining control of the assets; (b) Laundering money through what appears to be a legitimate business or businesses; (c) Hiding money in their homes, safes, or safety deposit boxes; (d) Using money to buy assets which are hard to trace by law enforcement. Records of these transactions are often found in the aforementioned locations.

105.    Additionally based on my training and experience and the training and experience of other investigators, I know persons involved in narcotic trafficking acquire personal and real property with their narcotic proceeds, and maintain evidence of financial transactions related to obtaining, transferring, secreting, or the spending of large sums of money made from narcotic trafficking activities.  These records include bank statements, passbooks, money drafts, checkbooks, tax returns, loan statements, escrow files, and wire transfer records.  Persons involved in drug trafficking will often convert the currency into cashier's checks, bearer bonds, precious metals, gold, diamonds, and other jewelry in an attempt to hide large amounts of currency, and that evidence of such will be located at the described locations.

106.    Individuals involved in narcotics trafficking often take, or cause to be taken, photographs of themselves, their associates, their property, and/or their drugs, and usually maintain these photographs in the aforementioned locations.

107.    Individuals involved in narcotics trafficking often maintain weapons, firearms, and ammunition on their person, in their residences, and/or in their vehicles in order to protect themselves and guard their drugs and drug profits, and for enforcement purposes during drug transactions.  These weapons and firearms can be used, and often are used, as an instrumentality of the crime of drug possession and distribution. Therefore, I am requesting permission to seize weapons, firearms, and ammunition that may be found at the premises to be searched, as indicated in the Attachment B.

108.    Individuals involved in narcotics trafficking often conceal evidence of their involvement in vehicles and outbuildings in order to prevent detection and seizure by law enforcement conducting lawful search warrants at residences.  Therefore I am requesting permission to search all vehicles and outbuildings located at each of the locations requested.

109.    Based on my training, experience and conversations with other experienced agents, I am familiar with the methods and practices used by individuals and organizations involved in illicit activities that generate large amounts of income. These methods include cash purchases, the purchasing of numerous monetary

instruments with cash in amounts less than $10,000, the use of aliases and nominees, the use of businesses as "front" in an attempt to legitimize and conceal their activities and the use of "off-shore" banking in an attempt to break the paper trail. These and other schemes are commonly referred to as "money laundering".

110.    Individuals normally maintain records of their financial activity, such as receipts for expenditures by cash and check, bank records, and other financial documents, in their personal residences. Furthermore, individuals engaged in an income-producing business keep records of the financial activities of the business for numerous reasons and often use accounts to complete financial statements and tax returns for their business and personal returns.

111.    Persons engaged in illegal activities and/or money laundering frequently retain records of their transactions within their residence, place of business, rented storage units, vehicles, or other places under their control. These records may be in the form of written notes and correspondence, receipts, negotiated instruments, contracts, bank statements, and other records. Records of this kind are also often stored on computer media.

112.    Persons engaged in drug trafficking and/or money laundering often maintain such records or long period of time, particularly when they are involved in ongoing criminal conduct over a long period of time. Based on my experience and review of *United States v. Greany*, 929 F.2d 523 (9th Cir. 1991), where there is evidence that the criminal activity is long-term ongoing criminal activity, it is more likely that evidence will be kept for long periods of time. In addition, based on *United States v. Angulo-Lopez*, 791 F. 2d 1394, 1399 (9th Cir. 1986), I believe that evidence of a continuous pattern of drug dealing may be found where the drug dealers reside.

113.    There are many reasons why criminal offenders maintain evidence for long periods of time. The evidence may be innocuous at first glance (e.g., financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, checkbooks, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials, computer hardware and software), but have significance and relevance when considered in light of other evidence. The criminal offender may no longer realize he/she still possesses the evidence.

114.    Individuals who amass proceeds from illegal activities routinely attempt to further that conduct and/or conceal the existence and source of their funds by engaging in

33

financial transactions with domestic and foreign institutions, and others, through all manner of financial instruments, including cash, cashier's checks, money drafts, traveler's checks, wire transfers, etc. Records of such instruments are routinely maintained at the individual's residence or place of business.

115. The terms "evidence" and "documents" as used above include all of the items of evidence more fully described in Attachment "B" in whatever form and by whatever means such evidence or documents, their drafts or their modifications may have been crated or stored, including, but not limited to any handmade form (such as writing, drawing, painting, with any implement on any surface, directly or indirectly); and photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); any electrical, or magnetic form (such as tape recording, cassettes, compact disks); and/or any information on an electronic or magnetic storage device (such as floppy diskettes, hard drives, backup media, disk cartridges, CD-ROMs, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks); as well as printouts or readouts from any magnetic storage device.

## Request to Seal

116. This Affidavit contains information regarding potential targets, which if unsealed may jeopardize the very information sought to be gained by these search warrants and arrest warrants. In light of the on-going nature of the investigation, and the likelihood that notice to WRIGHT, MCDOWELL, or other members of the DTO may cause them to destroy evidence, flee from prosecution, and notify confederates, your Affiant requests that this Affidavit and the resulting Search Warrants and Arrest Warrants be sealed on the Court's docketing system, with the exception of copies utilized by law enforcement officers participating in the investigation and a copy of the Search Warrant and an inventory of any items seized that will be left at the locations of the execution of the Search Warrants.

///

///

///

///

///

34

## Conclusion

117.    I hereby request that:  (1) search warrants be issued based upon the
aforementioned facts, commanding the immediate search of the persons, premises and
vehicles above designated for the property or things above described; (2) arrest
warrants be issued for WRIGHT and MCDOWELL; and issuance of an order
authorizing acquisition of GPS location data for TT#4.


I swear, under the penalty of perjury, that the foregoing information is true and correct to the best
of my knowledge, information, and belief.


Karl Schmid
Special Agent, Drug Enforcement Administration


Sworn and Subscribed to me on January 23, 2015,


Hon. EDMUND F. BRENNAN
United States Magistrate Judge

Approved as to form:


JUSTIN L. LEE
Assistant United States Attorney

## Attachment A-1

*Location to be Searched: 8299 Gwinhurst Circle, Sacramento, California.*

The premise to be searched is 8299 Gwinhurst Circle, Sacramento, California, which is located near the south east corner of the intersection of Hardester Drive and Gwinhurst Circle, Sacramento, California. The numbers "8299" are posted on a pillar to the right of the front door. A picture of 8299 Gwinhurst Circle, Sacramento, California is provided below.

The residence to be searched is a two story residential home with a wooden fence around the backyard. The residence has beige siding with some brick accents and a dark composite roof. The residences front door is located on the west side of the residence and faces north. The residence also has two attached garages which face north.

The search of the aforementioned residence shall include:
ANY AND ALL attachments, to include attics, basements, garages, safes, carports, outbuildings, trailers, appurtenances thereto, and all other areas within the curtilage, and a 2011 Ford Explorer bearing California license plate: 7GDU010, and any vehicles parked on the premises.



## Attachment A-2

*Location to be Searched: 5541 Crystal Hill Way, Sacramento, California*

The premise to be searched is located on the north side of Crystal Hill Way and north of the intersection of Crystal Hill Way and Calvine Road, Sacramento, California. 5541 Crystal Hill Way is described as a single-story residence with beige siding accented by stone with a dark composite roof and an attached garage. The front door and attached garage both face south. The numbers "5541" are posted on the residence near the garage.

The search of the aforementioned location shall include:
ANY AND ALL attachments, to include attics, basements, garages, safes, carports, outbuildings, trailers, appurtenances thereto, and all other areas within the curtilage.



# **Attachment B**

### *Items to be Seized*

1. Any cocaine, methamphetamine, heroin, MDMA, Marijuana, drugs or drug paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting or cutting agents; drug packaging materials, including plastic, tin foil, cellophane, jars, plastic bags, capsules, and other containers;

2. United States currency and foreign currency; money counting machines; and money wrappers;

3. Money ledgers, drug distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed;

4. Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics;

5. Telephone paging devices, beepers, cellular telephones, car phones, answering machines and tapes, and other communication devices;

6. Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, photographs, audio and video recordings, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

7. Financial instruments purchased with large amounts of currency, including travelers checks, bonds, stock certificates, cashier's checks and certificates of deposit;

8. Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, or jewelry;

9. Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, rental vehicle agreements, hotel and restaurant receipts, canceled checks, maps and written directions to location;

10. Handguns, shotguns, rifles, ammunition and other firearms;

11. Devices commonly used to conduct counter-surveillance against law enforcement including, but not limited to, scanners, police radios, surveillance cameras, recordings of surveillance footage, monitors, anti-bugging devices, and devices used to detect the presence of wiretaps, recording devices, transmitters, and/or receipts or literature describing the same;

12. Personal property tending to show the existence and/or location of other stored illegal drugs including, but not limited to, storage locker receipts, records, and maps, safety deposit keys and corresponding documents;

13. Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records.

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| | ) | |
| 6 Cellular Telephones seized at | ) | Case No. |
| 8299 Gwinhurst Circle | ) | 2:15-SW 00418 **AC** |
| Sacramento, California | ) | |
| | ) | |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ California _____ *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENTS A-1 through A-6, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before _____ August 6, 2015 _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: <u>any authorized U.S. Magistrate Judge in the Eastern District of California.</u>

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:      7/23/15 3:45 pm                     *Judge's signature*

City and state:      Sacramento, California                     Allison Claire, U.S. Magistrate Judge
                                                                    *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |

Inventory of the property taken and name of any person(s) seized:

## Certification

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

Subscribed, sworn to, and returned before me this date.

_____
Signature of Judge

_____
Date